WILLIAM RITA, petitioner-respondent,

*v.*

TERESA RITA, defendant-appellant.

[Submitted October 15th, 1946.   Decided February 3d, 1947.]

*Mr. Stanley W. Greenfield,* for the respondent.

*Mr. Martin P. O'Connor* (*Mr. Martin B. O'Connor* and *Mr. Ralph V. Mancini,* of counsel), for the appellant.

The opinion of the court was delivered by

RAFFERTY, J.

This is the wife's appeal from a decree of divorce entered against her.

The proofs to sustain the allegations of adultery set forth in the husband's petition and supplied by the husband and a private investigator were directed to a showing that almost nightly between October 25th, 1943, and November 7th, 1943, the wife entertained in her residence the alleged co-respondent under such circumstances as to justify the application of the well understood inclination and opportunity rule, there being no direct proof of adultery.

The parties had not lived in amicable relationships for a considerable period of time prior to the dates alleged and although they occupied the same dwelling house they slept in separate quarters. The husband made his own meals and attended to his own domestic chores. Two children were born of the marriage, the younger of whom was a daughter who attended high school and was fifteen years of age at the time of the hearing below. She resided with the mother. An older daughter was away at college, the expenses of which were provided by the mother either directly or through borrowings from her relatives.

The husband testified that on October 25th, 1943, and the following evening he heard footsteps in the hallway leading into the wife's apartment. He made no effort to learn who the person was or the purpose of the visit except that as the person was leaving the premises several hours later he looked from a window to determine the identity of the person. On the first occasion he did not recognize the visitor but on the second evening he did recognize him as a neighbor living several doors away and who is the person charged as being co-respondent. The husband then engaged the private investigator and together they watched the residence nightly and learned that the alleged co-respondent made these frequent visits to the wife's apartment. The pattern of conduct within the apartment as made out by the testimony is that the alleged co-respondent would call early in the evening; that later the

light in the daughter's bedroom would be extinguished and sometime thereafter the entire apartment would be in darkness although the alleged co-respondent would not leave the apartment until an hour or more after the lights were entirely extinguished. Particularly, it was testified, that on the night of October 29th, the lights in the daughter's bedroom were extinguished at 9:30 P. M.; at 10:30 P. M., all other lights in the apartment were extinguished and that co-respondent left the apartment at 11:30 P. M.

In the early evening of November 7th the husband communicated with the investigator, as a result of which he came to the husband's apartment. Shortly after his arrival the husband and he went directly to the living room of the wife and opened the door with a key, whereupon, according to their testimony, they found co-respondent stretched out at length on a couch lying on his back with the wife lying on top of him. They testified that co-respondent and the wife were fully clothed and there was no exposure of the person whatsoever. The wife and co-respondent stood mute, they stated, while the husband exclaimed to co-respondent: "You can marry her, you can have her." There was testimony also that sometime prior to these alleged happenings the husband found amongst his wife's personal effects several letters from a soldier whom the wife had met at a seashore resort, which indicated that the wife had carried on some flirtation with this soldier and that she had been known to the soldier and others as "Miss" Rita.

In her defense the wife admitted the frequent visits of co-respondent to her apartment but made positive denials of any improprieties occurring between them. She denied that the investigator and her husband found her and co-respondent on the couch as indicated, although admitting his presence in the living room on the occasion. She stated that she had known co-respondent and his mother for twenty years and had frequently visited both of them at their residence. In this she was supported by the younger daughter, who testified affirmatively that, except for the November 7th instance, she was at home in her mother's apartment on the occasions of the visits by co-respondent; that she never went to bed before

co-respondent left the residence and that at no time while co-respondent was in the premises was the apartment in darkness. Both testified that co-respondent first came to the premises to repair a light and that on other occasions he repaired some household furnishings and a baton which the daughter used at high school. The wife testified that for several years previous to the occurrences alleged the husband had sought to induce her to establish a residence in Nevada for the purpose of obtaining a divorce from him but that she declined the suggestion.

The husband admitted that his wife had made two attempts during their estrangement to gain access to his bed. She lay with him on these occasions but he refused to have relations with her because he was suspicious of her motive.

The daughter testified that she was not home at the time of the visit of her father and the investigator on the evening of November 7th but it is clear that she did arrive at the apartment very shortly thereafter and while co-respondent was still there.

Concluding that these proofs justified a finding of adultery against the wife, the Advisory Master advised the decree of divorce here appealed from. It was the view of the court below that the episode of November 7th established guilty inclination as of that date and, relating this back to the events described as occurring on October 29th, the charge of adultery was made out.

While the question of credibility is preeminently one for the Advisory Master, *Grewe* v. *Grewe, 138 N. J. Eq. 296,* and this court will give great weight to the findings of that judicial officer, *Carlan* v. *Phelps, 91 N. J. Eq. 312, 314,* nevertheless our investigation and analysis of the evidence leads us to the conclusion that the decree appealed from must be reversed. To infer guilt of adultery from the testimony of the husband and the private investigator we must indulge in surmise and conjecture. We cannot assume the wife to be so wanton as to risk disgrace before a young daughter whom, we must also assume, had retired and was sleeping in a bedroom of the apartment. When contrasted with the express denials of the wife and the convincing testimony of the fifteen-

year-old daughter, there is such lack of probative quality thereto that the finding of adultery is entirely negatived, or to say the most for it, leaves us in great doubt therein. *Lotz* v. *Lotz, 129 N. J. Eq. 476, 477,* and cases there cited.

The decree appealed from is reversed.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, HEHER, WACHENFELD, DILL, JJ.   5.

*For reversal*—BODINE, DONGES, PERSKIE, COLIE, EAST-WOOD, WELLS, RAFFERTY, FREUND, MCGEEHAN, JJ.   9.